Case No. 17-5065

# UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

SAMUEL FIELDS

*Plaintiff-Appellant*

v.

SCOTT JORDAN, Warden

*Defendant-Appellee*

On Appeal from the United States District
Court for the Eastern District of Kentucky
Case No. 7:15-cv-38

**(Death Penalty Case)**

## PETITION FOR REHEARING EN BANC BY WARDEN SCOTT JORDAN

**DANIEL CAMERON**
**Kentucky Attorney General**

Matthew F. Kuhn
 *Solicitor General*
Jeffrey A. Cross
 *Deputy Solicitor General*

Office of the Kentucky
 Attorney General
700 Capital Avenue
Suite 118
(502) 696-5300
Matt.Kuhn@ky.gov

*Counsel for Warden Scott Jordan*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................ii

RULE 35 STATEMENT .....................................................................1

INTRODUCTION .............................................................................1

BACKGROUND ...............................................................................3

ARGUMENT ....................................................................................7

   I.    The panel gravely erred on a question of exceptional importance............8

    A.   No Supreme Court decision holds that the jury experiment here is unconstitutional. ........................................................................8

    B.   Circuit precedent is irrelevant to whether the jury's experiment violates AEDPA...............................................................................14

CONCLUSION .................................................................................17

CERTIFICATE OF COMPLIANCE ....................................................18

CERTIFICATE OF SERVICE ............................................................19

# TABLE OF AUTHORITIES

## Cases

*Brecht v. Abrahamson*,
  507 U.S. 619 (1993) ............................................................................... 17

*Brown v. Davenport*,
  142 S. Ct. 1510 (2022) ...................................................................... 9, 17

*Cassano v. Shoop*,
  10 F.4th 695 (6th Cir. 2021) .................................................................. 3

*Doan v. Brigano*,
  237 F.3d 722 (6th Cir. 2001) ................................................... 15, 16, 17

*Fields v. Commonwealth*,
  12 S.W.3d 275 (Ky. 2000) ..................................................................... 6

*Fields v. Commonwealth*,
  274 S.W.3d 375 (Ky. 2008) ......................................................... 3, 4, 6

*Fields v. Commonwealth*,
  No. 2013-SC-0231, 2014 WL 7688714 (Ky. Dec. 18, 2014) ................... 6, 15, 17

*Fletcher v. McKee*,
  355 F. App'x 935 (6th Cir. 2009) ..................................................... 6, 15

*Harrington v. Richter*,
  562 U.S. 86 (2011) ............................................................................ 3, 7

*Holbrook v. Flynn*,
  475 U.S. 560 (1986) ............................................................................. 17

*Irvin v. Dowd*,
  366 U.S. 717 (1961) ............................................................................. 10

*Lopez v. Smith*,
  574 U.S. 1 (2014) (per curiam) ............................................. 1, 9, 13, 17

*Nevada v. Jackson*,
  569 U.S. 505 (2013) (per curiam) ............................................. 1, 13, 17

*Parker v. Gladden*,
  385 U.S. 363 (1966) (per curiam) ....................................................... 10

*Parker v. Matthews,*
    567 U.S. 37 (2012) (per curiam) ...........................................................16

*Patterson v. Colorado,*
    205 U.S. 454 (1907) ...............................................................................9

*Shoop v. Cunningham,*
    143 S. Ct. 37 (2022) ...............................................................................3

*Turner v. Louisiana,*
    379 U.S. 466 (1965) .............................................................................10

*United States v. Avery,*
    717 F.2d 1020 (6th Cir. 1983) ......................................................... 6, 15

*Wetzel v. Lambert,*
    565 U.S. 520 (2012) (per curiam) ...........................................................2

*White v. Wheeler,*
    577 U.S. 73 (2015) (per curiam) .............................................................7

*White v. Woodall,*
    572 U.S. 415 (2014) ................................................... 1, 11, 12, 17

**Statutes**

28 U.S.C. § 2254 ....................................................................................7

**Other Authorities**

6th Cir. Pattern Jury Instructions (Oct. 1, 2021) .....................................13

**Rules**

6th Cir. R. 32.1 ...............................................................................15, 16

Fed. R. App. P. 35 ..................................................................................1

## RULE 35 STATEMENT

This habeas appeal asks whether the Supreme Court has clearly established that a jury experiment in the jury room violates the Constitution. By answering this question in the affirmative, a divided panel of this Court required the Commonwealth of Kentucky to retry a decades-old murder case. The full Court should decide this question of exceptional importance to ensure this Court's AEDPA case law is uniform and does not conflict with Supreme Court precedent. Fed. R. App. P. 35(b); *see, e.g.*, *White v. Woodall*, 572 U.S. 415, 426–27 (2014); *Lopez v. Smith*, 574 U.S. 1, 5–7 (2014) (per curiam); *Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (per curiam).

## INTRODUCTION

Nearly 30 years ago, Samuel Fields murdered 84-year-old Bess Horton. He almost decapitated her and buried a knife in her skull so far that the point protruded from the other side of her head. The police found Fields in the room with Ms. Horton's body, and he admitted three times to murdering her.

After he was convicted and sentenced to death, Fields claimed that a jury experiment in the jury room entitles him to habeas relief. The district court (Judge Thapar) disagreed, reasoning that "the rule of law that Fields posits here—that

juries must not conduct experiments in the jury room—is one that the United States Supreme Court has never recognized." Mem. Op., R.68, PageID#13141.

A divided panel reversed and granted habeas relief. The panel believed itself bound by circuit precedent about what the U.S. Supreme Court has held. Op. 8. Judge Batchelder dissented because "no Supreme Court precedent establishes that jury experiments violate the Sixth Amendment." *Id.* at 15 (Batchelder, J., dissenting). As to the circuit precedent on which the panel relied, Judge Batchelder determined it had been abrogated by intervening Supreme Court decisions because it "extended a general jurisprudential principle to a new legal context, thereby creating a new rule of constitutional law." *Id.* at 16.

The full Court should rehear this case. No U.S. Supreme Court decision comes close to holding that a jury experiment like that here violates the Constitution. And circuit precedent is not to the contrary. In any event, the full Court is not bound by that precedent.

The stakes here are exceptionally high. If the panel's decision stands, the Commonwealth will be forced to retry this case nearly "three decades after the crime, posing the most daunting difficulties for the prosecution." *See Wetzel v. Lambert*, 565 U.S. 520, 525 (2012) (per curiam) (emphasis omitted). To allow the panel's deeply flawed analysis to reopen Ms. Horton's 1993 murder in 2022 would

be "an insult to Congress and a disservice to the people of" Kentucky. *See Shoop v. Cunningham*, 143 S. Ct. 37, 44 (2022) (Thomas, J., dissenting from denial of cert.). Even when AEPDA is faithfully applied, it "intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (citation omitted). The injury to state sovereignty is all the more profound when—decades after the crime—a federal court wrongly overrules a State's authority to punish a murderer. The Supreme Court's repeated use of its limited bandwidth to reverse this Court's mistaken AEDPA decisions underscores the importance of this matter. *See Cassano v. Shoop*, 10 F.4th 695, 696–97 (6th Cir. 2021) (Griffin, J., dissenting from denial of reh'g en banc) (collecting cases).

## BACKGROUND

**1.** Samuel Fields murdered Bess Horton in the early morning hours of August 19, 1993. *Fields v. Commonwealth*, 274 S.W.3d 375, 390 (Ky. 2008) (*Fields I*). Fields had spent the afternoon before "drinking heavily and consuming 'horse tranquilizers'" with his girlfriend, Minnie Burton. *Id.* At some point, the two began fighting, with Fields "throwing furniture, knives, and other objects." *Id.* Burton left and went home. *Id.*

Ms. Horton owned the duplex in which Burton lived. At the time, Ms. Horton "was in the process of evicting Burton." *Id.* When Burton arrived at the duplex, she "was unable to gain entry" and "sat on the front porch." *Id.* at 390–91. Sometime later, Fields showed up. He "was making a loud commotion" and was carrying a knife. *Id.* at 391. He "took Burton's keys and told her that he would get into the duplex, implying that he might break in." *Id.* A neighbor heard the commotion and called the police. *Id.* at 390–91.

Two officers responded. Mem. Op., R.68, PageID#13127. Ms. Horton lived close by, and the officers eventually found Fields in her bedroom. One of the officers saw Ms. Horton lying on the bed. Tr., R.30-14, PageID#6047. "Her 'throat was slashed,' and a knife was jammed all the way through her skull: the knife was 'buried to the hilt in her right temple' and 'the point of the blade protruded from her left.'" Mem. Op., R.68, PageID#13124 (citation omitted). When the police found Ms. Horton, her "hands were literally inside her throat." *Id.* at PageID#13129 (citation omitted). The officer asked Fields, "What's going on? What are you doing?" Tr., R.30-14, PageID#6048. Fields responded: "I stabbed her, and I'm into it big time this time. . . . I'm going to go to prison for the rest of my life." *Id.*

The officers arrested Fields. *Id.* After receiving *Miranda* warnings, Fields said, "Kill me. Shoot me. I'm into it deep. I killed her." Mem. Op., R.68, PageID#13129–30. The officers discovered several knives and razor blades on his person. Tr., R.30-14, PageID#6049; Tr., R.30-13, PageID#5951–52. At trial, the parties referred to one of those knives as the "twisty knife." Tr., R.30-13, PageID#5908, 5953. The Commonwealth argued that Fields used the twisty knife to remove screws on a storm window on Ms. Horton's house to break in. Tr., R.30-23, PageID#7478–79.

The officers then took Fields to a hospital, where an emergency medical technician examined him. Tr., R.30-15, PageID#6160. The EMT asked Fields "where the blood was coming from." *Id.* at PageID#6163. Fields responded "in no uncertain terms" that "if [the EMT] had killed some lady that [he] would have blood on [him] as well." *Id.*

**2.** A jury convicted Fields of burglary and murder, and he was sentenced to death.[1]

While the jury deliberated, a juror wondered whether Fields could have used the twisty knife to remove the screws on the storm window. Post-Conviction

---

[1] This was the second trial. In the first, a jury convicted Fields of burglary and murder, and he was sentenced to death. *See Fields v. Commonwealth*, 12 S.W.3d 275,

Record (PCR), R.89-3, PageID#13522. Another juror responded that it "wouldn't be that hard" and used the twisty knife to remove the screws from a cabinet in the jury room. *Id.* at PageID#13521–22. The juror who raised the issue testified that the experiment "wasn't what, you know, said that he was guilty or not guilty." *Id.* at PageID#13522. After all, no one disputed that Fields was in Ms. Horton's house when the police found him, so how he got in was ultimately beside the point.

**3.** Fields appealed to the Supreme Court of Kentucky, which affirmed Fields's convictions and sentence. *Fields I*, 274 S.W.3d at 390. Fields then moved in state court to vacate his convictions and sentence, after which the state trial court held a three-day evidentiary hearing. *Fields v. Commonwealth*, No. 2013-SC-0231, 2014 WL 7688714, at *2 (Ky. Dec. 18, 2014) (*Fields II*). After the trial court denied relief, the Supreme Court of Kentucky again affirmed. *Id.* at *15. Relevant here, Kentucky's high court rejected Fields's jury-experiment claim based in part on this Court's decisions allowing similar jury experiments in *United States v. Avery*, 717 F.2d 1020 (6th Cir. 1983), and *Fletcher v. McKee*, 355 F. App'x 935 (6th Cir. 2009). *Fields II*, 2014 WL 7688714, at *3–4.

---

277 (Ky. 2000). But the Supreme Court of Kentucky reversed that conviction on direct appeal. *Id.* at 285.

**4.** Fields then petitioned for habeas relief in the Eastern District of Kentucky. In a nearly 120-page decision, Judge Thapar rejected Fields's claims. Mem. Op., R.68, PageID#13124. Judge Thapar certified one claim for appeal, Order, R.82, PageID#13439, and this Court certified four more (including the jury-experiment claim), App.R.36-1 at 2.

Over Judge Batchelder's dissent, a panel of this Court reversed the district court's judgment based on the jury-experiment issue and conditionally granted habeas relief unless the Commonwealth retries Fields within six months. Op. 5, 14.

## ARGUMENT

The Antiterrorism and Effective Death Penalty Act of 1996, as relevant here, allows a federal court to upset a state-court judgment in two narrow circumstances: when the state decision is contrary to or involves an unreasonable application of clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). Under this demanding standard, relief is allowed only if the state court's decision is "so lacking in justification" as to be "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. That the death penalty is at stake here does not make AEDPA's standard any less strict. *White v. Wheeler*, 577 U.S. 73, 81 (2015) (per curiam).

The panel here cobbled together this Court's precedent and several Supreme Court decisions to discern a rule that the Supreme Court has never hinted at: that jury experiments in the jury room violate the Constitution when they involve extrinsic evidence. Rather than confront the lack of Supreme Court case law on jury experiments, the panel retreated to circuit precedent that it viewed as holding that the Supreme Court has in fact established such a rule. That badly misreads circuit precedent. But even if circuit precedent dictated the panel's holding, the en banc Court should overrule that precedent.

## I.    The panel gravely erred on a question of exceptional importance.

### A.    No Supreme Court decision holds that the jury experiment here is unconstitutional.

The Supreme Court has never adopted the panel's rule against jury experiments. The panel seemed to recognize as much when it read Fields's favored Supreme Court decisions as holding that "the jury's receipt of evidence outside the courtroom may violate a criminal defendant's Fifth and Sixth Amendment rights." Op. 6. Of course, that holding "speak[s] only at a high level of generality" and

thus "cannot supply a ground for relief" under AEDPA. *See Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022).

The panel could not identify a single Supreme Court decision holding that jury experiments in the jury room can violate the Constitution. In fact, the Supreme Court decisions on which the panel relied *do not even concern jury experiments*. Op. 6–7. This absence of case law should have "alone suffice[d] to establish that the Kentucky Supreme Court's conclusion was not 'objectively unreasonable.'" *See Woodall*, 572 U.S. at 423 (citation omitted).

A quick survey of the panel's four favored Supreme Court cases shows that they stand for only the most general of propositions. *Patterson v. Colorado* did not even involve a jury trial, much less a jury experiment. 205 U.S. 454, 458 (1907). *Patterson* concerned imposing contempt for publishing articles and a cartoon "intended to embarrass the court in the impartial administration of justice." *Id.* at 458–59. The only statement from *Patterson* cited by the panel (at 6) was that "conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence." *Id.* at 462. But "[t]his proposition is far too abstract to establish clearly the specific rule [Fields] needs." *See Lopez*, 574 U.S. at 4.

9

*Irvin v. Dowd* is no more specific. 366 U.S. 717 (1961). That case dealt with jurors prejudging a case, not experimenting with evidence. *Id.* at 727–28. *Irvin* held that it violates a defendant's rights when eight out of twelve jurors "thought [the defendant] was guilty" before the trial. *Id.* at 727. This fact-bound holding has no purchase here. The panel, however, cited *Irvin* (at 7) for the notion that a verdict must "be based upon the evidence developed at the trial." *Id.* at 722. But that abstract statement does not clearly establish the rule that Fields needs.

The panel also mentioned *Turner v. Louisiana*, 379 U.S. 466 (1965). But the issue there was whether it violates a defendant's rights when the prosecution's primary witnesses are the same deputy sheriffs who stayed with the jury during sequestration. *Id.* at 468, 473. The panel cited *Turner* (at 7) for the proposition that the "'evidence developed' against a defendant shall come from the witness stand in a public courtroom." *Id.* at 472–73. Here again, such a general statement does not get Fields to a clearly established prohibition against jury experiments in the jury room.

The same is true of the panel's final favored case. *Parker v. Gladden* involved a bailiff making disparaging comments about the defendant in private to the jury.

10

385 U.S. 363, 363–64 (1966) (per curiam). *Parker* did not concern a jury experiment. And the panel cited *Parker* only for its "foundational principle" about not influencing a jury. Op. 7.

In short, the panel's favored Supreme Court cases "d[o] not hold that jury experiments [a]re unconstitutional but merely la[y] down the principle that 'trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand.'" *See* Op. 16 (Batchelder, J., dissenting) (citation omitted).

**2.** This generalized principle does not suffice under AEDPA. The Supreme Court's *Woodall* decision provides the roadmap here. The issue there was whether the Constitution requires a no-adverse-inference instruction when a defendant chooses not to testify during the penalty phase of a trial. *Woodall*, 572 U.S. at 418–19. The Supreme Court had addressed a similar question during the guilt phase. *Id.* at 420. And the Supreme Court had also held that, generally speaking, "the privilege against self-incrimination applies to the penalty phase." *Id.* at 421. But no prior Supreme Court decision directly addressed the question presented, and so the petitioner was left to argue that Supreme Court precedent "together" leaves only one reasonable conclusion. *See id.* at 420 (citation omitted). In reversing this Court's judgment, the Supreme Court held that federal courts may not extend

Supreme Court precedent even when doing so may be the "logical next step." *Id.* at 426–27. "'[I]f a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *Id.* at 426 (citation omitted).

The same reasoning applies here. The general rule on which the panel relied is that juries must base their decisions on record evidence. But applying that abstract rule to the specific facts here does not yield a result "so obvious" as to be beyond "fairminded disagreement." *See id.* at 427. Fields tries to simplify matters by reasoning that the jury based its verdict on extrinsic evidence because the experiment with the twisty knife used screws from the filing cabinet. But which Supreme Court case holds that the abstract rule Fields identifies applies to jury experiments in the jury room? And which Supreme Court case tells us when a jury impermissibly considers extrinsic evidence in the jury room?[2] All Fields can muster to answer these questions are four cases that do not even concern jury experiments. He thus asks for exactly the kind of inferential extension of precedent that

---

[2] Line-drawing problems abound about what constitutes extrinsic evidence in the jury room. For example, the panel said that the jury considered extrinsic evidence in part because no juror had a similar blood-alcohol content to Fields when he used the twisty knife. Op. 9. This perhaps suggests that a jury considers extrinsic evidence if it merely examines record evidence without the same physical state as the defendant.

the Supreme Court rejected in *Woodall*. And *Woodall* is far from the only time the Supreme Court has held that extending its precedent is not the province of habeas review. *See, e.g.*, *Lopez*, 574 U.S. at 5–7; *Jackson*, 569 U.S. at 512.

The panel's extension of a general rule to cover the facts here glosses over a lot of nuance that this Court cannot resolve under AEDPA without more specific guidance from the Supreme Court. For example, jurors are routinely told to rely on their common sense and life experience to evaluate witness credibility and other evidence. *See, e.g.*, 6th Cir. Pattern Jury Instructions 1.05(1) (Oct. 1, 2021). Yet a juror's common sense and life experience are not subject to cross-examination or rebuttal. Judge Thapar pinpointed this problem perfectly in discussing whether the jury's experiment violates the general rule Fields identifies:

> Admittedly, one might argue that the answer should be "yes." After all, Fields did not have the chance to subject these "experimenters" to cross examination in open court. . . . But one might also argue that the answer should be "no." After all, the jurors did in some sense rely on "the evidence presented"—they simply examined the twisty knife, which was in fact in evidence. And thus one might say that the jurors simply *examined* the evidence—albeit in an unusual way—but ultimately "based" their verdict on the evidence itself. Meanwhile, we actively encourage juries to use their "common sense" and we at least tolerate them using their own "life experiences"—both of which are not formally admitted as evidentiary exhibits during the course of a trial. Finally, once we start quibbling with the reasoning process that jurors use during deliberation, it is hard to know where to stop. May a juror tell his peers "in my experience, I don't think it could have happened that way?" May a juror say "he seemed like the kind of liars I've met in my life?"

Mem. Op., R.68, PageID#13144.

To be sure, there might be reasons for drawing some lines and not others when jurors consider extra-record information during deliberations. But the Supreme Court has never articulated a rule telling us under what circumstances—or even whether—a jury experiment in the jury room is unconstitutional. On AEDPA review, that ends the matter.

## B.    Circuit precedent is irrelevant to whether the jury's experiment violates AEDPA.

The panel acknowledged (at 7) the Warden's argument that Fields "frames the rule of law at an exceptionally high level of generality." But the panel did not engage with this contention because it determined that Sixth Circuit precedent already speaks to what is clearly established law. That is wrong but, at this stage, ultimately irrelevant.

The panel held that two circuit decisions—one published, the other not— "bind [it] to the general determination that Supreme Court precedent, namely *Parker* and *Turner*, has clearly established that jury experimentation that brings extrinsic evidence to the jury's attention violates the Fifth and Sixth Amendments." Op. 8. Of course, an unpublished decision could not "bind" the panel to anything. *See* 6th Cir. R. 32.1(b). Even still, the cited non-binding decision cuts against the panel. The jury experiment there involved admitted evidence and a table in the

jury room, *Fletcher*, 355 F. App'x at 936, the latter of which would seem to be extrinsic evidence under the panel's rule, Op. 9. But in *Fletcher*, this Court denied habeas relief because the experiment "did not result in extrinsic evidence that subjected the jury to extraneous influence." *Id.* at 940; *accord Avery*, 717 F.2d at 1026 (allowing similar jury experiment on direct review).[3]

The panel also relied on *Doan v. Brigano*, 237 F.3d 722 (6th Cir. 2001). Op. 7–8. But that case is twice removed from this one. For one thing, the issue there was whether a state procedural rule that prohibited the state court from even considering the jury experiment was contrary to clearly established law. *Id.* at 725, 731–32. For another, the jury experiment in *Doan* was unlike that here. Op. 8 (acknowledging "factual differences"). In *Doan*, the defendant claimed he could not see bruises on a child in a dark room. 237 F.3d at 726–27. To test this statement, a juror put lipstick on her arm while at home and tried to see it in similar light. *Id.* at 727. The juror then reported the results of her out-of-court experiment to her fellow jurors. *Id.* The Court explained that "what triggers concerns of a constitutional dimension[] is the fact that [the juror] conducted an out-of-court

---

[3] The Supreme Court of Kentucky relied on both *McKee* and *Avery* in denying relief on Fields's jury-experiment claim. *Fields II*, 2014 WL 7688714, at *3–4. That this Court has twice upheld a jury experiment much like that here proves this issue is not beyond fairminded disagreement. Op. 17 (Batchelder, J., dissenting).

experiment and reported her findings to the jury in the manner of an expert witness." *Id.* at 733. Nowhere did *Doan* hold that, as a matter of Supreme Court precedent, jury experiments in the jury room are off-limits.

It follows that the panel was very wrong to conclude that *Doan* tied its hands as to what is clearly established law. What "trigger[ed]" the AEDPA violation in *Doan* is nothing like what happened here, where the jurors witnessed the experiment in the jury room. PCR, R.89-3, PageID#13516. As a result, the panel did not simply follow published precedent. It extended that precedent to grant habeas relief, even though circuit precedent "cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) (per curiam).

The full Court, however, need not split hairs about what *Doan* held. If *Doan* determined that clearly established law prohibits the jury experiment here, that holding should be overruled. 6th Cir. R. 32.1(b). *Doan* impermissibly "extended a general jurisprudential principle to a new legal context, thereby creating a new rule of constitutional law." Op. 16 (Batchelder, J., dissenting). As a decision from 2001, *Doan* did not have the benefit of "the Supreme Court's warnings against imaginative extensions of high-level principles." *Id.*; *accord Woodall*, 572 U.S. at 426–27; *Lopez*, 574 U.S. at 5–7; *Jackson*, 569 U.S. at 512. In fact, *Doan* did exactly

16

what those more recent cases forbid. It took a general proposition, like the evidence "brought against a defendant and considered by the jury [must] be presented at trial," *Doan*, 237 F.3d at 733, and extended it to hold that a juror may not "conduct[] an out-of-court experiment and report[] her findings to the jury in the manner of an expert witness," *id.*[4]

## CONCLUSION

The full Court should rehear this case.

**DANIEL CAMERON**
**Kentucky Attorney General**

*s/ Matthew F. Kuhn*
Matthew F. Kuhn                                   Office of the Kentucky
 *Solicitor General*                                    Attorney General
Jeffrey A. Cross                                   700 Capital Avenue, Ste. 118
 *Deputy Solicitor General*                       (502) 696-5300
                                                  Matt.Kuhn@ky.gov

*Counsel for Warden Scott Jordan*

---

[4] The panel also found that Fields satisfied the prejudice standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993), in part because the evidence against him was "sparse." Op. 12. But Fields confessed three times. And the police found him in the room with Ms. Horton's body. So it is "extraneous to debate" whether the twisty knife could have removed the screws from the storm window. *See Fields II*, 2014 WL 7688714, at *4. The panel also discounted a juror's later statement that the jury experiment did not decide Fields's guilt. Op. 12; *see* PCR, R.89-3, PageID#13522. In this respect, the panel relied on *Holbrook v. Flynn*, 475 U.S. 560 (1986). Op. 12. But the Supreme Court recently emphasized that "[n]othing in [*Holbrook*] purported to forbid courts from considering post-trial testimony about how [an event] *actually* affected juror deliberations." *Davenport*, 142 S. Ct. at 1530.

## CERTIFICATE OF COMPLIANCE

I certify that this petition for rehearing en banc complies with the type-volume requirements for such a petition, as it contains 3,884 words. Fed. R. App. P. 35(b)(2)(A) & 40 (b)(1).

I also certify that this petition for rehearing en banc complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 15-point Garamond font.

*s/ Matthew F. Kuhn*

## CERTIFICATE OF SERVICE

I certify that on December 15, 2022, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Matthew F. Kuhn*

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0256p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

SAMUEL FIELDS,

*Petitioner-Appellant,*

> No. 17-5065

*v.*

SCOTT JORDAN, Warden,

*Respondent-Appellee.*

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Pikeville.
No. 7:15-cv-00038—Karen K. Caldwell, District Judge.

Argued:  May 18, 2022

Decided and Filed:  December 1, 2022

Before:  BATCHELDER, MOORE, and DONALD, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Daniel E. Kirsch, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Kansas City, Missouri, for Appellant.  Brett R. Nolan, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.  **ON BRIEF:**  Daniel E. Kirsch, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Kansas City, Missouri, for Appellant.  Brett R. Nolan, Matthew F. Kuhn, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

DONALD, J., delivered the opinion of the court in which MOORE, J., joined. BATCHELDER, J. (pp. 15–17), delivered a separate dissenting opinion.

———————

## OPINION

———————

BERNICE BOUIE DONALD, Circuit Judge.  This case stems from the nearly thirty-year-old murder of Bess Horton.  The commonwealth's theory of prosecution was that Samuel Fields broke into Horton's residence through a storm window, brutally murdered her in the bedroom, and started burglarizing the residence shortly before law enforcement arrived at the scene.  To test the plausibility of the commonwealth's theory, the jury conducted an experiment using a flat-tipped knife submitted into evidence to remove a cabinet door in the jury room (in place of the storm window).  Satisfied with the outcome of their experiment, the jurors convicted Fields of intentional murder and sentenced him to death.  Fields now seeks a federal writ of habeas corpus, arguing in part that the jury improperly considered extrinsic evidence in violation of the Fifth and Sixth Amendments.  For the following reasons, we REVERSE the district court's judgment and CONDITIONALLY GRANT a writ of habeas corpus, unless the commonwealth retries Fields within six months.

## I.

On August 18, 1993, Fields started consuming alcohol when he woke up and continued throughout the day.  *Fields v. Commonwealth*, No. 2013-SC-000231-TG, 2014 WL 7688714, at *1 (Ky. Dec. 18, 2014) ("*Fields I*").  In the evening, Fields and several others—including Minnie Burton (his girlfriend), Phyllis Berry, Scott Trent, and William Sloas—drove to James Berry's house.  *Id.*  The group sat in Berry's living room drinking alcohol and smoking marijuana.  *Id.*  Fields eventually became so intoxicated that Berry asked the group to leave.  *Id.*

*Approximately 11:30 p.m.*  Fields and Burton went to an apartment occupied by Fields' mother and brother.  *Id.*  Fields and Burton soon got into a fight, prompting Fields to throw furniture, knives, and other objects around the living room.  *Fields v. White*, No. 15-38-ART, 2016 WL 3574396, at *1 (E.D. Ky. June 23, 2016) ("*Fields II*").  Fields then started crying and saying that "he didn't have any control over his self."  *Id.*

*Approximately midnight.* Fearful of Fields' behavior, Burton went home. *Id.* Burton lived in a duplex owned by Horton. *Id.* Horton allowed Burton to live rent-free in the duplex in return for running Horton's errands and chauffeuring her around. *Id.* However, their relationship had recently soured, and Horton had shut off the utilities in an attempt to force Burton out. *Id.* When Burton returned home that night, she was locked outside. *Id.*

*Approximately 1:35 a.m.* Fields left his mother's apartment to look for Burton. *Fields I*, 2014 WL 7688714, at *1. As Burton sat on her front porch, she heard "a lot of hooting and hollering and what sound[ed] [like] somebody hitting [street] signs real hard . . . ." *Fields II*, 2016 WL 3574396, at *2. Fields then appeared with a knife in his hand. *Id.* He pushed the knife toward Burton and said, "take this. I've killed my brother, John." *Id.* (Fields had, in fact, not killed his brother.) Burton took the knife and dropped it into some nearby bushes.

*Approximately 1:55 a.m.* When Fields learned that Burton was locked out, he slammed his hand through her apartment window. *Fields I*, 2014 WL 7688714, at *1. Burton's neighbor, Elmer Pritchard, heard the noise and called the police to report a break-in at the duplex. *Fields II*, 2016 WL 3574396, at *2. Officer Larry Green responded to the scene less than two minutes later, but neither Burton nor Fields was there; Burton had fled to a nearby relative's house, and Fields had walked to Horton's house approximately one block over. *Fields I*, 2014 WL 7688714, at *1-2.

*Approximately 2:11 a.m.* Green called for backup to help conduct a search, and Sergeant Ron Lindeman responded. *Fields II*, 2016 WL 3574396, at *2. The officers searched various buildings in the area to no avail. *Id.*

*Approximately 2:23 a.m.* The officers noticed a light on and the external garage door open at Horton's residence. *Id.* Upon further investigation, the officers found a storm window and seventeen screws lying on the porch. *Id.*; *Fields I*, 2014 WL 7688714, at *2. Lindeman entered the house through the window and saw blood on a curtain and comforter. *Fields II*, 2016 WL 3574396, at *3. He proceeded down the hallway and into the back bedroom where he saw Fields rummaging through a drawer next to Horton's body. *Id.* Fields had blood on his shirt and pants, and Horton had a knife buried in her right temple with the point of the blade protruding

from the opposing temple. *Id.*; *Fields I*, 2014 WL 7688714, at *2. Horton also had defensive wounds on her hands, which were stuffed inside her throat. *Fields II,* 2016 WL 3574396, at *3. Her throat was slashed almost to the point of decapitation. *Id.*; *Fields I*, 2014 WL 7688714, at *2. Lindeman asked Fields, "What's going on? What are you doing?" *Fields II,* 2016 WL 3574396, at *3. Fields stated, "Kill me, Ron, just kill me. I stabbed her, and I'm into it big time this time." *Id.* When Lindeman asked Fields why he did it, Fields replied, "I don't know. I just did it. Kill me. I'm going to prison for the rest of my life." *Id.* Fields was immediately arrested and found to be in possession of Horton's jewelry, two razor blades, and a butter knife with the point missing and the tip twisted in an unusual way. *Id.* at *3-4; *Fields I*, 2014 WL 7688714, at *2. (This knife became known as the "twisty knife" throughout trial.)

*Approximately 5:17 a.m.* The officers took Fields to a hospital approximately thirty minutes away. *Fields II,* 2016 WL 3574396, at *4. An EMT examined Fields and inquired "where the blood was coming from." *Id.* According to the EMT, Fields responded, "in no uncertain terms[,] that if [the EMT] had killed some lady that [the EMT] would have blood on [him] as well." *Id.* Subsequent testing revealed that none of the blood on Fields' clothing was traceable to Horton and none of the blood in Horton's bedroom was traceable to Fields. At the hospital, the emergency department ordered a blood alcohol test, and the report indicated that Fields had a blood alcohol content of 0.14.

In 2003, Fields stood trial for a second time on one count of murder and one count of first-degree burglary.[1] *Fields I,* 2014 WL 7688714, at *2. At trial, the commonwealth argued that Fields used the twisty knife to unscrew seventeen paint-covered screws, remove the storm window, and break into Horton's home. *Id.* Defense counsel conversely argued that Fields was too intoxicated to unscrew the storm window and commit the murder within the short timeframe. *Id.* During deliberations, the jurors decided to conduct their own experiment by using the twisty knife, introduced into evidence by the commonwealth, to unscrew and remove a cabinet door in the jury room. *Id.* at *3. After eight hours, the jury found Fields guilty as charged. The matter

---

[1]Fields was originally tried and convicted in 1998. However, the Kentucky Supreme Court found that reversible errors occurred during the trial, reversed the convictions, and remanded the matter for a new trial.

then proceeded to the penalty phase, and after twelve hours of deliberations, the jury sentenced Fields to death.  The Kentucky Supreme Court affirmed.

Fields then moved for post-conviction relief in the state trial court.  *See Fields I*, 2014 WL 7688714, at *2.  Following a three-day evidentiary hearing, the trial court denied the motion.  *Id.*  The Kentucky Supreme Court again affirmed.  *Id.*  Fields then filed the underlying petition for a writ of habeas corpus, alleging thirty claims for relief.  *See Fields II*, 2016 WL 3574396, at *1.  The district court denied the petition but certified for appeal one of the requested grounds for relief:  the trial court improperly excluded from the sentencing phase evidence of parole-eligibility statistics.  *Id.* at *54.  We expanded the certificate of appealability to include four additional claims:  (1) the jury's experiment involving evidence not in the record violated Fields' constitutional rights to confrontation, due process, and a fair trial; (2) trial counsel were ineffective for failing to investigate and present the testimony of James Berry; (3) trial counsel were ineffective for failing to present expert testimony regarding the effects of drugs and alcohol on Fields' ability to commit the alleged crimes; and (4) trial counsel were ineffective for failing to present additional mitigating evidence at the penalty phase.  Because we resolve the jury experiment claim in Fields' favor, and it is dispositive of the case, we address only that claim herein.

## II.

We review a district court's decision regarding a writ of habeas corpus *de novo*.  *Ege v. Yukins*, 485 F.3d 364, 371 (6th Cir. 2007) (citing *Wolfe v. Brigano*, 232 F.3d 499, 501 (6th Cir. 2000)).  "Because the district court did not conduct an evidentiary hearing but rather relied on the trial transcript in making its fact findings, we must review the district court's factual findings de novo."  *Burton v. Renico*, 391 F.3d 764, 770 (6th Cir. 2004) (citing *Bugh v. Mitchell*, 329 F.3d 496, 500 (6th Cir. 2003)).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs our review of this case.  As relevant here, a federal court may grant habeas relief only if the state court's decision on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law[.]"  28 U.S.C. § 2254(d)(1).  A state court decision is "'contrary

to' clearly established federal law if 'the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts.'" *Lundgren v. Mitchell*, 440 F.3d 754, 762-63 (6th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). An "unreasonable application" occurs when "the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. Legal rules that are stated in general terms can still be applied in an unreasonable manner, because "AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'" *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (quoting *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in judgment)).

"A federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003). AEDPA thus requires federal courts to review state court decisions with a degree of "deference and latitude." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). To obtain habeas relief in federal court, a state prisoner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

A.

Fields contends that the Kentucky Supreme Court unreasonably applied *Patterson v. Colorado*, 205 U.S. 454 (1907), *Irvin v. Dowd*, 366 U.S. 717 (1961), *Turner v. Louisiana*, 379 U.S. 466 (1965), and *Parker v. Gladden*, 385 U.S. 363 (1966), in denying his challenge to the jury's experiment during deliberations.

Through this long line of cases, the Supreme Court has recognized that the jury's receipt of evidence outside the courtroom may violate a criminal defendant's Fifth and Sixth Amendment rights. At the turn of last century, the Court noted, "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence." *Patterson*, 205 U.S. at 462. Faced with the

development of "swift, widespread and diverse methods of communication" over the following decades, the Court reinforced that theory and held that the constitutional right to an impartial jury requires the verdict to "be based upon the evidence developed at the trial." *Irvin*, 366 U.S. at 722 (holding that eight jurors' predisposed opinions as to guilt based on adverse pre-trial publicity violated the defendant's right to an impartial jury). Shortly thereafter, the Court expounded on that concept to require "at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner*, 379 U.S. at 472-73 (holding that the testifying officers' continuous and intimate association with the jurors outside of the courtroom violated the defendant's constitutional rights). The Court further reiterated this foundational principle the following year. *See Parker*, 385 U.S. at 364-66 (citing *Turner* and holding that a bailiff's prejudicial comments to jurors during deliberations violated the defendant's constitutional rights).

The warden argues that Fields frames the rule of law at an exceptionally high level of generality. He contends that none of the cases cited by Fields "purported to apply that rule in the context of a jury experimenting with evidence during deliberations," and as a result, the broad rule does not meet the constraints of AEDPA. However, applying the standards from *Parker* and *Turner*, the Sixth Circuit has twice recognized in the context of jury experiments that "jury exposure to extrinsic evidence or other extraneous influence violates a defendant's Sixth Amendment rights, and a state court decision that conflicts with this rule may justify habeas relief under the standard set forth in the AEDPA." *Fletcher v. McKee*, 355 F. App'x 935, 937 (6th Cir. 2009) (internal citations omitted); *Doan v. Brigano*, 237 F.3d 722, 729-36 (6th Cir. 2001).

In *Doan*, a juror conducted an at-home experiment to test the defendant's credibility and reported the results to the rest of the jury during deliberations. During her experiment, the juror applied lipstick to her arm to replicate a bruise and attempted to view the "bruise" in a room lit similarly to the defendant's bathroom. *Doan*, 237 F.3d at 727. The juror then informed the other members of the jury that the bruises were visible, in direct contradiction of the defendant's testimony. *Id.* at 726-27. This Court found that the experiment and its results injected

extraneous evidence into the jury's deliberations which the defendant had no chance to refute. *Id.* at 733.    Accordingly, we concluded that the juror's experiment conflicted with the defendant's constitutional rights under *Parker* and *Turner*.  *Id.*

In *Fletcher*, the jurors conducted an experiment during deliberations to determine where the gun would have fallen if the victim had accidentally shot herself as the defense claimed.  One juror held the gun and fell off a table, as the victim supposedly would have fallen off the bed, while the other jurors watched the trajectory of the gun.  *Fletcher*, 355 F. App'x at 936.  Based partly on this reenactment, the jury concluded that the victim had not accidentally shot herself and thus rejected the defendant's theory of the case.  *Id.*  This Court acknowledged that "[a]s a matter of law, clearly established Supreme Court precedent requires that a criminal defendant be afforded the right to confront the evidence and the witnesses against him, and the right to a jury that considers only the evidence presented at trial."  *Id.* at 937 (quoting *Doan*, 237 F.3d at 733 n.7 (citing *Parker*, 385 U.S. at 364-65; *Turner*, 379 U.S. at 472-73)).  However, we ultimately held that the jurors' recreation of the crime scene involved no extrinsic evidence, and thus, did not subject them to extraneous influence in violation of the defendant's constitutional rights.  *Id.* at 940.

Although circuit precedent itself does not constitute clearly established federal law, "[w]e are bound by prior Sixth Circuit determinations that a rule has been clearly established [by the Supreme Court]."  *Tolliver v. Sheets*, 594 F.3d 900, 916 n.6 (6th Cir. 2010) (citing *Smith v. Stegall*, 385 F.3d 993, 998 (6th Cir. 2004)); *see also Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) ("[A]n appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent.").  Thus, despite the factual differences, these cases bind us to the general determination that Supreme Court precedent, namely *Parker* and *Turner*, has clearly established that jury experimentation that brings extrinsic evidence to the jury's attention violates the Fifth and Sixth Amendments.

The Kentucky Supreme Court identified in its opinion that Fields had a constitutional right to a fair and impartial jury that considered only the evidence presented at trial.  *Fields I*, 2014 WL 7688714, at *3-4.  However, the court took a very narrow view of the issue and

ignored the role of the cabinet and its components in the experiment. The court held that "jurors are free to use their own senses, observations, and experiences to conduct an experiment or reenactment with already admitted evidence." *Id.* at *4 (citing *Fletcher*, 355 F. App'x at 935). Based on this rationale alone, the court determined that the jurors permissibly conducted a reenactment with the twisty knife. The court thus concluded that the jury did not decide guilt based on something other than the evidence presented at trial.

There is a stark difference between examining evidence in the record and using tangible objects in the deliberation room as an integral part of an experiment to prove the prosecution's theory. Here, the jurors conducted an experiment, which may have been flawed in its methodology, on material that was not admitted and thus not subject to the procedural safeguards of trial. The jury used the twisty knife to remove screws of a different nature than the screws in the storm window. The cabinet contained unpainted, universal screws while the storm window contained Phillips head screws, fourteen of which were coated with paint.[2]   No evidence established whether the screws in the jury room were installed with the same tension and force as the screws in the storm window, or whether the cabinet door was fastened to the cabinet in the same manner as the storm window was fastened to the window frame. In addition, the jury removed the cabinet door under potentially different circumstances than Fields would have removed the storm window. No evidence established whether the cabinet hung at a similar height to the window, or whether the jurors conducted the experiment in the dark with a blood alcohol content greater than .14—an issue that itself would be equally, if not more, concerning than the glaring problems already posed herein. Under these circumstances, we find that the experiment exposed the jurors to extraneous evidence which Fields had no chance to refute.

Therefore, it is "beyond any possibility for fairminded disagreement" that the Kentucky Supreme Court unreasonably applied clearly established federal law in failing to address the jurors' consideration of evidence not admitted into the record. *Harrington,* 562 U.S. at 103.

---

[2]In support of Fields' actual innocence claim, a Department of Public Advocacy Investigator averred that "the juror room universal screw would have been much easier to remove with the flat broken tip of the 'twisty knife' than removing a standard Philips head screw with the same knife."

## B.

A habeas petitioner is entitled to relief only if the trial error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Under this standard, the petitioner must show "actual prejudice." *Id.* The petitioner must establish "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

The Supreme Court recently clarified that "satisfying *Brecht* is only a necessary, not a sufficient, condition to relief." *Brown v. Davenport*, 142 S.Ct. 1510, 1520 (2022). Where, as here, the state court reached the merits of a harmlessness determination, a petitioner must also demonstrate that the court "applied *Chapman* [*v. California*, 386 U.S. 18 (1967)] in an objectively unreasonable manner." *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (internal quotation marks omitted).

In *Chapman*, the Supreme Court announced that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. The Court placed the burden on "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* Here, the Kentucky Supreme Court did the exact opposite. The court concluded, "we cannot say beyond a reasonable doubt that the jury experiment contributed to the verdict." *Fields I*, 2014 WL 7688714, at *4. By this language, the court inverted the *Chapman* standard and required Fields to prove beyond a reasonable doubt that the error did contribute to the verdict obtained. Instead, the court properly should have required the state to prove beyond a reasonable doubt that the jury experiment did not contribute to the verdict. Because the Kentucky Supreme Court applied a rule of law that contradicted *Chapman*, we must now apply the *Brecht* standard.

At trial, the commonwealth theorized that Fields committed the murder by unscrewing seventeen screws with the twisty knife, gaining access to the house, and inflicting fatal stabs to

Horton, all within a fourteen-minute timeframe.  *Fields I*, 2014 WL 7688714, at *2; *Fields II*, 2016 WL 3574396, at *4.  In contrast, Fields claimed that he arrived through the already open window to rob Horton after the murder, and that it would have been impossible for him to break in and commit the murder in such a limited timeframe given his intoxicated state.  *Fields II*, 2016 WL 3574396, at *4-5.  Thus, Fields' ability to unscrew the window was a central issue at trial.

During opening statements, the prosecutor demonstrated how much time Fields would have had to break into the residence.  The prosecutor stated,

> . . . I'd like for all of us to just see how long a minute can be.  And when the secondhand gets to the 10, I'm going to stop talking.  Now.  And that's been about thirty seconds.  Do you think that's enough time to take a screw, a little Phillips head screw, a little short Phillips head screw, out of a piece of wood?  Forty seconds.  Fifty seconds.  That's a minute.  And I don't mean to be melodramatic here or, you know, playacting or anything, but it's important for us to keep how long one minute can be.

The prosecutor revisited this demonstration during closing arguments:

> This is the window through which the Defendant went.  And you know we have heard, and you're going to hear—you get to look at these screws, seventeen screws.  That's a lot of screws.  To do it with a knife, sure.  That—You know, that's one of the things about this case.  We don't get to make up the facts, but these are the facts.  It takes a person who really wants to get in to use this knife.  You know, remember my overdramatic, let's wait a minute and see how long a minute is, in the opening statement that I gave so many—so long ago.  Well, I think you now—you understand what I was talking about in that.  A minute is a long—can be a long period of time.  And let's say—let's give the Defendant seventeen minutes from let's say 2 o'clock.  That gives him five minutes to get from the front—from the street there on Second Street across the parking lot to Ms. Horton's and around the house and up to the front.  So, let's start that clock at 2 o'clock.  And let's give him a minute per screw.  That gets him in the house at 2:17.

The commonwealth argued that given the short timeframe of events, "there wasn't any opportunity for anyone else to have done this."

At the close of evidence, the jury deliberated for eight hours.  A review of the record shows that the jurors extensively questioned whether Fields could "have unscrewed those screws."  During trial, one juror asked the judge to pose the following question to a defense

witness: "How long does it usually take to install a large storm window?"  During deliberations, the jurors conducted the experiment to test the commonwealth's theory and "see if it was possible to be done."  At the post-conviction hearing, one of the jurors testified "that wasn't what, you know, said that he was guilty or not guilty, but it just satisfied my mind that it was possible that you could have done that[.]"  According to the juror, "I knew a man's life hanged in the balance, and I wanted to be sure of everything[.]"  The same juror stated in an affidavit that the "experiment helped prove that Mr. Fields could have committed the crime."[3]  Under these circumstances, we find that the jury's experiment directly challenged the central issue at trial, vitiated Fields' key defense arguments, and substantially bolstered the commonwealth's theory of how Fields committed the murder.

At oral argument, the warden heavily relied on the juror's testimony that the experiment alone did not determine guilt.  However, the juror's subjective testimony about the effect the experiment had on them bears little weight.  Whenever a due process error "'involves such a probability that prejudice will result . . .,' little stock need be placed in jurors' claims to the contrary."  *Holbrook v. Flynn*, 475 U.S. 560, 570 (1986) (citations omitted) (quoting *Estes v. Texas*, 381 U.S. 532, 542-43 (1965)).  "Even though a practice may be inherently prejudicial, jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused."  *Id.*  "[T]herefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.'"  *Id.* (quoting *Estelle v. Williams*, 425 U.S. 501, 505 (1976)).  Balancing the inherently prejudicial nature of the experiment with the weight of the evidence against Fields, we find that such an unacceptable risk was present.

The evidence of guilt was sparse.  The only physical evidence tying Fields to the murder was his presence at the scene.  The commonwealth alleged that Fields used the twisty knife to remove an external storm window and climbed into Horton's residence.  However, the commonwealth's own experts testified that the paint on the twisty knife did not match the paint on the screws, and that Fields' fingerprints were not found on the storm window.  Also, it is

---

[3]The Kentucky Supreme Court considered both the jurors' affidavits and their testimony at the post-conviction hearing.  *Fields I*, 2014 WL 7688714, at *3.

undisputed that Fields was bleeding that night—he had shattered a glass window with his hand and the officers found his blood on the sidewalk, the back porch steps, and the front porch handle of Horton's residence. *Fields II*, 2016 WL 3574396, at *4. But, as we noted earlier, subsequent testing revealed that none of his blood was found on Horton and none of Horton's blood was found on him.

All we are left with then are Fields' confessions. "We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." *Escobedo v. Illinois*, 378 U.S. 478, 488-89 (1964) (footnotes omitted). The confessions here are particularly suspect due to the impaired mental state of Fields at the time he gave them. For example, earlier that same night, Fields declared that he had "killed" his brother and needed to dispose of the alleged murder weapon. *Fields II*, 2016 WL 3574396, at *2. This "confession" later proved to be false. *Id.* In addition, Fields' statements do not comport with the physical evidence. An EMT testified that Fields had implied the blood on his clothing resulted from killing "some lady." *Id.* at *4. But we know that the blood testing does not corroborate such an implication. Furthermore, the medical records show that Fields had a blood alcohol content of .14—nearly twice the legal limit—at the time of his third confession and more than two hours after the other two confessions.[4] It is undisputed that Fields adamantly maintained his innocence once sober.

Finally, it should be noted that Fields is not the only person who allegedly confessed to the murder. At least two witnesses testified that Burton confessed, "I was tired of that Son of a Bitch telling me who I can have in my apartment and who I can't. . . . I killed her, and she can't tell me nothing." Burton also had both the opportunity and the motive to murder Horton. *Fields II*, 2016 WL 3574396, at *4.

---

[4]"[T]he percentage of alcohol in an individual's blood typically decreases by approximately 0.015 percent to 0.02 percent per hour once the alcohol has been fully absorbed. More precise calculations of the rate at which alcohol dissipates depend on various individual characteristics (such as weight, gender, and alcohol tolerance) and the circumstances in which the alcohol was consumed." *Missouri v. McNeely*, 569 U.S. 141, 152 (2013) (citing Stripp, Forensic and Clinical Issues in Alcohol Analysis, in Forensic Chemistry Handbook 435, 437-41 (L. Kobilinsky ed. 2012)).

Given the centrality of the issue, the inherently prejudicial nature of the experiment, and the lack of overwhelming evidence of guilt, we find that the jury experiment had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776). Based on this record, we cannot say that the jury's consideration of extrinsic evidence was harmless. Fields is therefore entitled to a writ of habeas corpus unless the commonwealth retries him within six months.[5]

### III.

For the foregoing reasons, we **REVERSE** the district court's judgment and **CONDITIONALLY GRANT** Fields' petition for a writ of habeas corpus, unless the commonwealth retries him within six months.

---

[5]There was some confusion in the record regarding the timing of the jury experiment—*i.e.*, whether it took place during the guilt or penalty phase. Although no court before us has expressly resolved this factual determination, it is "plain from [its] opinion" that the Kentucky Supreme Court implicitly found the experiment occurred during the guilt phase. *Townsend v. Sain*, 372 U.S. 293, 314 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). The Kentucky Supreme Court addressed whether the jury experiment violated Fields' constitutional rights, and thus, entitled him to a new trial. *Fields I*, 2014 WL 7688714, at *3. After reviewing the record, the court held that the experiment "did not contribute to the[] verdict because it simply proved that it was possible to remove the screws using the knife, *not that [Fields] murdered the victim*." *Id.* at *4 (emphasis added). In its harmless error analysis, the court doubled down on its reasoning and found that the experiment only determined a collateral issue raised in the guilt phase. *Id.* We must afford a presumption of correctness "to those implicit findings of fact that are inherent in [the state court's] resolution of conflicting evidence." *McPherson v. Woods*, 506 F. App'x 379, 387 (6th Cir. 2012) (citing *Marshall v. Lonberger*, 459 U.S. 422, 433 (1982)).

---

**DISSENT**

---

ALICE M. BATCHELDER, Circuit Judge, dissenting.

The Kentucky Supreme Court did not unreasonably apply clearly established federal law by finding that the jury's "twisty knife" experiment did not violate the Sixth Amendment. No U.S. Supreme Court case states a rule that prohibits the jury, in its entirety, from experimenting with admitted evidence during deliberations in the jury room. Moreover, the Kentucky Supreme Court—relying on three analogous cases—reasonably applied the U.S. Supreme Court's broad precedent concerning extrinsic evidence, extraneous information, and jury experiments. Therefore, Fields has not satisfied AEDPA, and the district court properly denied his petition. Because I would affirm the district court, I must respectfully dissent.

## I.

AEDPA requires that before a federal court grants a writ of habeas corpus, it must find that the State court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This dooms Fields' claim because no Supreme Court precedent establishes that jury experiments violate the Sixth Amendment. Circuit precedent cannot fill in gaps or extend Supreme Court cases to establish new legal rules. *White v. Woodall*, 572 U.S. 415, 426 (2014) ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error.") (emphasis in original). And the Supreme Court has repeatedly warned against "framing [Supreme Court] precedents at such a high level of generality." *Lopez v. Smith*, 574 U.S. 1, 6 (2014) (quoting *Nevada v. Jackson*, 569 U.S. 505, 512 (2013)); *see also Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) ("This Court's dicta cannot supply a ground for relief. Nor can holdings that speak only at a high level of generality.") (internal citations omitted). Otherwise, circuit courts "could transform even the most

imaginative extension of existing case law into 'clearly established Federal law as determined by the Supreme Court.'" *Jackson*, 569 U.S. at 512 (quoting 28 U.S.C. § 2254(d)(1)).

In *Smith*, 574 U.S. at 3-4, the Ninth Circuit had extended the general principle that a defendant must have notice of the charges against him, to require that a defendant must have notice of the theory of liability the government intends to pursue. In *Jackson*, 569 U.S. at 510, the Ninth Circuit had extended general holdings that certain restrictions on cross-examination were unconstitutional, to entitle a criminal defendant to present extrinsic evidence on a collateral matter of a witness' credibility. The Supreme Court reversed the Ninth Circuit in both *Smith* and *Jackson*, admonishing the Ninth Circuit for its extension of precedent via application of abstract principle to new legal context. *Smith*, 574 U.S. at 9; *Jackson*, 569 U.S. at 512.

*Doan v. Brigano*, 237 F.3d 722, 732 (6th Cir. 2001), committed similar error. It found that the lipstick/bruise jury experiment violated "clearly established federal law" as set forth under *Turner v. Louisiana*, 379 U.S. 466 (1965), and *Parker v. Gladden*, 385 U.S. 363 (1966). Those Supreme Court cases did not hold that jury experiments were unconstitutional but merely laid down the principle that "trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand." *Turner*, 379 U.S. at 472-73. What *Turner* and *Parker* actually *did* hold is that a jury's prejudicial discussion of a trial with non-jurors outside of the jury room violates the Sixth Amendment. *See Turner*, 379 U.S. at 467-69 (police officers who testified for prosecution also oversaw jurors during trial and conversed freely during mealtimes); *Parker*, 385 U.S. at 363-64 (bailiff who shepherded jurors told jurors the defendant was guilty).

*Doan*, like *Smith* and *Jackson*, extended a general jurisprudential principle to a new legal context, thereby creating a new rule of constitutional law. *Doan* was decided in 2001, a mere five years after AEDPA's passage and before the Supreme Court's warnings against imaginative extensions of high-level principles. Considered in the light of *Smith* and *Jackson*, I must conclude that the Supreme Court has abrogated *Doan* and that we are no longer bound to follow it.

## II.

The Kentucky Supreme Court reasonably applied the general principle that Fields' trial must be fair and decided by an impartial jury. It identified three cases, all decided after *Parker* and *Turner*, which held or implied that jury experiments do not violate the Sixth Amendment. *See United States v. Avery*, 717 F.2d 1020, 1026 (6th Cir. 1983); *Banghart v. Origoverken*, 49 F.3d 1302, 1306 (8th Cir. 1995); *Fletcher v. McKee*, 355 F. App'x 935 (6th Cir. 2009). These holdings demonstrate the reasonableness of the Kentucky Supreme Court's analysis. Unless it is "so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question," a state court does not unreasonably apply federal law. *White v. Woodall*, 572 U.S. 415, 427 (2014) (internal quotation marks omitted). Because the Kentucky Supreme Court reasonably applied federal law, Fields is not entitled to relief.

## III.

For the foregoing reasons, I would affirm the judgment of the district court and must respectfully dissent.